744 A.2d 691 (2000)
328 N.J. Super. 64
FIRST INDEMNITY OF AMERICA INSURANCE COMPANY, Plaintiff/Respondent,
v.
David KEMENASH, Defendant/Third-Party Plaintiff/Appellant.
Kathleen Kemenash, Nicole Kemenash, Davina Kemenash, and NDK General Contractors, Inc., Defendants/Third-Party Plaintiffs,
v.
Patrick Lynch, Third-Party Defendant.
Superior Court of New Jersey, Appellate Division.
Argued November 29, 1999.
Decided February 10, 2000.
*692 Todd W. Heck, Vineland, for defendant/third-party plaintiff/appellant (Basile & Testa, attorneys; Mr. Heck, on the brief).
Robert E. Nies, Roseland, for plaintiff/respondent (Wolff & Samson, attorneys; Mr. Nies, of counsel; Robert L. Tchack, on the brief).
Before Judges KEEFE, A.A. RODRIGUEZ and LINTNER.
The opinion of the court was delivered by KEEFE, J.A.D.
Defendant David Kemenash appeals from an order granting partial summary judgment to plaintiff First Indemnity of America Insurance Company (FIA) in the amount of $3,248,171.17, plus prejudgment interest. The judgment was on "fewer than all the claims as to all parties," but was certified as final. R. 4:42-2. Although defendant did not move for leave to appeal as required by the Court Rules, we now grant leave to appeal on our own motion. See Pressler, Current N.J. Court Rules, comment on R. 2:5-6 and R. 4:42-2(19). We affirm.
Defendant owned a corporation, D. Kemenash & Associates, Inc. (DKA), a general contractor. DKA defaulted on two municipal construction projects for which plaintiff had acted as surety. Plaintiff completed the projects under separate takeover contracts with the municipality. Then, relying on an indemnity agreement signed by defendant and his wife, plaintiff alleged it was entitled to reimbursement from defendant and his wife personally. Defendant, however, asserted that he had never provided plaintiff with an indemnity agreement for his construction business, and that the agreement on which plaintiff relied was signed in favor of another surety and placed in the possession of his insurance broker.
On appeal, defendant argues that the trial judge erred in denying his summary judgment motion premised on the six year *693 statute of limitations, and erred in granting plaintiff summary judgment because he improperly applied the summary judgment standard, by failing to grant defendant all favorable inferences and ignoring numerous areas of factual dispute. Finally, defendant challenges the judge's award to plaintiff of over $650,000 in prejudgment interest.
DKA was a commercial construction company that did a considerable portion of its work on large federal government and public works projects. It was in business from May 31, 1978, until mid-1991 when the company ceased work, having filed for bankruptcy.
As a standard requirement for each public works project on which DKA submitted a successful bid, DKA was required to obtain a performance bond. Although the precise date is unclear from the record, from at least the spring of 1984 until the spring of 1989, DKA obtained its bonds exclusively through a bonding agency, Comsur, Inc. ("Comsur"). Also during the same period, Travelers Insurance Company of Hartford ("Travelers") acted as the exclusive bonding company for DKA. As a guarantee for the bonds issued by Travelers, defendant and his wife signed indemnity agreements. Sometime in the spring of 1989, Travelers informed defendant that it no longer would be able to act as commercial surety for DKA because it had sold its surety bonding division.
On May 4, 1990, plaintiff executed performance and payment bond # 026696 for DKA in the amount of $5,289,000 on behalf of the Cape May County Municipal Utilities Authority ("MUA"). The space designated for the description of the bonded project is blank, but the parties agree that this project involved construction of a sanitary landfill ("the landfill project"). On May 9, 1990, plaintiff executed performance and payment bond # 026689 for DKA in the amount of $1,848,000 on behalf of the MUA with respect to DKA's construction of a bulky waste sorting/recycling facility and transfer station ("the bulky waste project"). These were the only two performance bonds plaintiff issued on DKA's behalf.
On April 2, 1991, defendant and his wife filed a voluntary petition for bankruptcy, and DKA also filed for bankruptcy. At or about the same time, DKA ceased work and abandoned the two MUA projects. Thereupon the MUA declared DKA to be in default, terminated its right to proceed under the contract and demanded that plaintiff, as surety, complete DKA's work on both projects.
On June 6, 1991, plaintiff and the MUA entered into takeover contracts whereby plaintiff became the "replacement contractor" and agreed to assume responsibility to complete both projects to the extent of the penal sums of each related bond. The contracts required the MUA to dedicate the remaining construction funds to completion of the projects, specifically the sum of $1,974,004.48 on the landfill contract and $575,849.26 on the bulky waste project, subject to reductions for expenses incurred as a result of DKA's default and the ensuing delay. Plaintiff agreed to discharge any mechanics liens against the project.
Plaintiff certified to the trial court in this action that, as to plaintiff's costs on the landfill project, it paid a total of $3,684,233.56 to claimants and received proceeds from the MUA of $1,716,459.51. As to the bulky waste project, it paid $973,444.25 and received $438,734.66 from the MUA. Thus, plaintiff's loss for the two projects totaled $2,502,483.64.[1]
*694 In January 1992, defendant was convicted in federal court of submitting fraudulent bank statements and served thirty-nine months in prison. On July 19, 1993, an order was entered denying discharge in the bankruptcy cases. The order was based on the terms of a settlement between defendant and the bankruptcy trustee wherein defendant agreed to consent to the denial of his discharge if he were unsuccessful in appealing his criminal conviction, which he was.
On December 30, 1997, plaintiff filed its complaint in this matter asserting that defendant and his wife owed plaintiff over $3,000,000. The basis for its allegations was an indemnity agreement defendant and his wife signed on June 11, 1984. The complaint alleged in paragraph 6 that on "June 11, 1984, in consideration for, and as a precondition of FIA's executing surety bonds on behalf of DKA, Kemenash, his wife and DKA executed an Agreement of Indemnity (the "Indemnity Agreement") in favor of FIA ..." A copy of that agreement was attached to the complaint. It provides:
WHEREAS D. KEMENASH & ASSOCIATES, INC. requires or may hereafter require suretyship upon certain bonds or obligations or suretyship and has applied or may hereafter apply to ______(hereafter called the Company) to execute such instruments as surety. NOW THEREFORE, should the company execute or procure the execution of the suretyship for which application is now pending, or which may be hereafter applied for, or other suretyship in lieu thereof, or in lieu of suretyship now outstanding, or in connection therewith, the undersigned, hereinafter called the Indemnitor does ... agree ...
Paragraph two of the document reads: [T]he indemnitor will perform all the conditions of each said bond or obligation, and any and all alterations, modifications, renewals, continuations, and extensions, thereof, and will at all times indemnify and save the Company harmless from and against every claim, demand, liability, loss, cost, charge, counsel fee, payable on demand of Surety, whether actually incurred or not, (including fees of special counsel whenever by the Company deemed necessary) expense, suit, order judgment [sic] and adjudication whatsoever, and any and all liability therefor, sustained or incurred by the Company by reason of having executed or procured the execution of said bonds or obligations, and will place the Company in funds to meet same before it shall be required to make payment, and in case the Indemnitor requests the Company join in the prosecution or defense of any legal proceeding, the Indemnitor will, on demand of the Company, place it in funds sufficient to defray all expenses and all judgments that may be rendered therein.
It is undisputed that in the copy submitted to the court with plaintiff's complaint, the spaces designated in the document for the name of the surety company and the address to which notification of termination was to be sent both remained blank.
On May 15, 1998, plaintiff filed its partial summary judgment motion. Plaintiff specifically relied on an admission defendant made in a deposition in the bankruptcy proceeding in which defendant is the sole named debtor. During this deposition, defendant stated that plaintiff issued the bonds for DKA. When questioned whether he and his wife personally guaranteed the bonds, defendant replied, "I don't believe so, but it could be that we both do guarantee it, but I'm not sure." He was then asked, "Do you guarantee them?" and he replied, "Yes."
Plaintiff also included a scheduled list of unsecured creditors dated April 16, 1991, and filed in the bankruptcy proceeding for defendant and his wife. The petition listed both plaintiff and Travelers, each for an "Unknown" amount. In a scheduled list of creditors for DKA, dated May 15, 1991, plaintiff and Travelers were also listed as *695 "contingent" debts for "Unknown" amounts.
On June 12, 1998, Carlos Andujar, an attorney for defendants, traveled to plaintiff's offices to inspect a document purported to be the original agreement. The pages of the document were bound along the left-hand margin "in a natural form," unseparated. That document contained plaintiff's name in the designated space, in a typeface different from that used to type "D. Kemenash & Associates, Inc." on the previous line. The document contained the original signatures of defendant and his wife on page three, along with the corporate seal of DKA, dated 1978. Also on page three, "bleeding" through from page four, were notary seals.
LeFevre, who in 1984 was employed as a notary public by Comsur, certified that he had notarized the signatures on the June 11, 1984, document. He stated:
Although FIA's name had not yet been typed into the first paragraph of the Agreement of Indemnity at the time Kemenash and his wife executed the document, I am certain that this was FIA's standard form of indemnity agreement. As I had notarized numerous other agreements, I know that no other surety company with which Comsur dealt, including the Travelers Indemnity Company, used that form of agreement at that time.
On June 16, 1998, defendants submitted papers responding to plaintiff's partial summary judgment motion and papers supporting their cross-motion. In their response to plaintiff's statement of material facts, defendants stated that the "referenced Agreement [of June 11, 1984] was executed in favor of another surety company, not FIA." In his accompanying affidavit, defendant asserted:
7. In 1984, DKA executed a preliminary Indemnity Agreement in connection with its recently-formed business relationship with Travelers. My wife and I joined in the Indemnity Agreement at the request of Comsur Inc., who took possession of the document.
8. This Indemnity Agreement was not executed in favor of the Plaintiff First Indemnity of American Insurance Company ("FIA"). DKA had no business dealings with FIA until the Spring of 1989, after Travelers announced to DKA that it was no longer able to act as commercial surety for DKA....
15. FIA never obtained an Indemnity Agreement for bonds it issued in favor of DKA from DKA, myself, and/or my wife. This is because when in 1989 DKA first commenced business with FIA, Travelers already had substantial, written indemnity rights against DKA, myself, and my wife (known to both FIA and Comsur at the time) upon numerous then-incomplete construction projects. FIA made a conscious decision at the time to only pursue indemnity agreements from me in connection with the separate DKR [D. Kemenash Equipment Sales & Rentals, Inc.] activities.
He also asserted that the version of the indemnity agreement produced during an FIA representative's deposition was "phony" and "nothing less than a fraud."
Plaintiff explicitly "[d]isputed that Travelers was the only surety company with whom DKA dealt between the Spring of 1984 and mid-1989." It asserted:
In the Spring of 1984, Kemenash and his broker met with FIA's then-lead underwriter to ask FIA to execute a bid bond for an out-of-state project that Travelers would or could not bond. FIA agreed to execute the bond, provided that DKA, Kemenash and his wife execute FIA's standard Agreement of Indemnity. Kemenash agreed, and DKA, Kemenash and Kemenash's wife thereafter executed that Agreement of Indemnity, dated June 11, 1984 (the "Indemnity Agreement"). DKA did not ultimately bid for the out-of-state project, however, and FIA accordingly did not execute a bid bond for that project. *696 Defendant denies that such a meeting ever took place. He admits, however, that he executed an indemnity agreement exactly like the one upon which plaintiff relies in connection with a surety bond issued by plaintiff in 1989 for a different company owned by defendant, D. Kemenash Equipment Sales and Rentals, Inc.

I.
Defendant argues that the trial judge erred in failing to dismiss the complaint on the ground that it was barred by the six-year statute of limitations. N.J.S.A. 2A:14-1. The trial judge held that plaintiff's action was not barred. He said: "It is clear from a review of all the cases that the plaintiff's cause of action accrued in this matter when the payments were made." The judge observed that plaintiff made its last payment on the bulky waste project on March 14, 1994, and its last payment on the landfill project on February 4, 1994. He thus found that "the amount of the plaintiff's loss was not fixed until after March of 1994."
In his primary argument on this issue, defendant asserts that plaintiff's cause of action first accrued on June 6, 1991, when it entered into the takeover contracts with the MUA. Thus, according to defendant, plaintiff's December 30, 1997, complaint was filed almost seven months beyond the expiration of the six-year limitations period.
Defendant reasons that, because the terms of the indemnity agreement provided for contractual indemnification "against mere claims, demands, and any liability, and not just loss or damage," plaintiff's cause of action accrued the moment liability was imposed upon it. He contends that at that point, on June 6, 1991, when plaintiff signed the takeover contracts, plaintiff was entitled to maintain an action to recover for breach of the indemnity contract.
Plaintiff, on the other hand, contends that the indemnity agreement contained a "bundle of rights," including the "mutually independent" rights to seek "exoneration" from the indemnitor in the form of posted collateral sufficient to cover liability and to "compel indemnifications for any losses actually sustained" by it. It asserts that "the statute of limitations on a claim for indemnification for loss begins to run only upon the occurrence of the loss, which occurs upon settlement of the case, final judgment against the indemnitee, or payment by the indemnitee." Plaintiff argues that, as a practical matter, its cause of action could not accrue until it made payments in excess of the money owed by the MUA on the underlying contract because "if the contract balances [paid by the MUA to plaintiff] had exceeded FIA's payments, FIA would have suffered no loss." It argues that no authority "bars an action for contractual indemnification against losses on statute of limitations grounds because the indemnitee chose not to pursue, or the statutes of limitations already expired on, its right to seek exoneration or indemnification for asserted liability."
Recovery on express or implied contractual claims or liability not under seal is governed by N.J.S.A. 2A:14-1, which provides that such action must be commenced within six years "after the cause of any such action shall have accrued." Where the agreement indemnifies for loss, the cause of action accrues at the point that the liability is discharged by payment and the indemnitee suffers an actual loss. Bernstein v. Palmer Chev. & Olds., Inc., 86 N.J.Super. 117, 122, 206 A.2d 176 (App.Div.1965). Where the agreement provides indemnification for liability, the cause of action arises with the liability and the plaintiff is entitled to recover the amount necessary to enable it to discharge the liability itself. North v. North & Son, Inc., 93 N.J.L. 438, 442, 108 A. 244 (E. & A.1919). In this case the agreement included language regarding both loss and liability, stating that plaintiff would be indemnified for "every claim, demand, liability, loss, cost, charge, counsel fee, payable on demand of Surety, whether actually incurred or not...." No New *697 Jersey case has considered the question of whether a party indemnified as to liability and loss in the same agreement may elect to proceed on either basis, with the concomitant different dates for the accrual of the action.
We assume for the purpose of this opinion, as defendant has asserted, that FIA's "liability" on the bond was fixed on June 6, 1991, when FIA executed project "takeover agreements" with the MUA for the two public construction contracts. Defendant's assertion that FIA could have instituted action against the indemnitors on that day is correct, but begs the question before us. Undoubtedly, FIA could have instituted suit on June 6, 1991, had it chosen to do so. The question, however, is whether FIA had the choice to sue either on the accrual of its cause of action based upon "liability" or elect to sue on the indemnity agreement when its cause of action for "loss" accrued. Although in some cases the accrual dates may actually be the same, see Winne v. Morrissey, 14 N.J. Misc. 771, 773, 187 A. 36 (Sup.1936), in this case, that is clearly not so. Here, FIA did not sustain a loss under its bond until such time as it paid out more money to subcontractors than it was owed by the MUA. According to the record before us, at the time the takeover agreements were signed, MUA owed $2,055,194.27 on both projects, after withholding $394,384.47 for delay expenses. FIA did not pay more than it was owed on both projects until December 30, 1991, when it made a payment of $353,626.16 to Cacon, Inc., a subcontractor of DKA, with respect to the landfill project. Thus, if FIA had the choice under the indemnity agreement to sue on its right to be indemnified against loss rather than liability, its complaint was timely.
Authority on the issue is sparse. In Balboa Ins. Co. v. Zaleski, 12 Conn.App. 529, 532 A.2d 973, 977 (Ct.), certif. denied, 206 Conn. 802, 535 A.2d 1315 (1987), the defendant was a contractor who had individually executed a general indemnity agreement in favor of the plaintiff. Id. at 974. The plaintiff, as surety, had issued a performance bond and a labor and material bond to the town of Chester with respect to the defendant's construction of a school roof. Ibid. On September 21, 1979, in a letter to the defendant and the surety, the town alleged that the defendant had abandoned the project and declared that it was terminating the contract. Ibid. One of the defendant's suppliers thereafter brought suit against the surety for payment under the bond and was awarded judgment on October 27, 1981. Ibid. The surety then commenced suit against the defendant on the indemnity agreement, serving the complaint on October 2, 1985. Id. at 974-75. The defendant argued that the limitations period had begun to run on September 21, 1979, when the plaintiff received notice of the defendant's default. Id. at 975. The plaintiff asserted that it had begun on October 27, 1981, when it incurred its first loss. As in this case, a six-year limitations period applied to the action. Id. at 974.
The terms of the parties' agreement indemnified the plaintiff against liability as well as loss. Id. at 977. The court found that the plaintiff's cause of action "arose at once upon its becoming liable on the contractor's bond." Ibid. (quoting Dickson v. United States Fidelity & Guar. Co., 150 Miss. 864, 117 So. 245, 247-48 (1928)). The court held:
The immediate right to bring suit against the defendant accrued to the plaintiff upon the defendant's default of its roof replacement contract with the town of Chester. Under the provisions of [the] general indemnity agreement, and under the rule of law concerning a contract which indemnifies against liability as well as loss, the plaintiff's cause of action accrued upon the defendant's default in the underlying performance and labor and material payment bonds. This is so notwithstanding the fact that the plaintiff had not yet suffered a determined or fixed loss.

[Ibid.] *698 Thus, the plaintiff's cause of action was barred by the six-year statute of limitations. Ibid.

We decline to follow the Balboa court's holding for several reasons. First, the reasoning is flawed. The Mississippi case relied upon was not a statute of limitations case. Rather, it was a case in which the question presented was whether the indemnitee's suit against the indemnitor was premature where the indemnification agreement permitted a suit based upon both liability and loss. The Mississippi court held that the contract between the parties permitted the indemnitee to bring suit when liability occurred irrespective of loss. Dickson, supra. Simply stated, the surety was entitled to the benefit of its bargain. Secondly, and perhaps more significantly, the Connecticut Legislature overruled Balboa by statute. Republic Ins. Co. v. DiNardo Auto Sales, 44 Conn. Supp. 207, 678 A.2d 516, 519 (Ct.1995), aff'd, 41 Conn.App. 686, 677 A.2d 21 (Ct.), certif. denied, 239 Conn. 906, 682 A.2d 1005 (Ct.1996). As the latter case noted, Balboa did not reflect "settled" law in the state at the time it was decided. Id. at 521.
The more reasoned approach in our view is expressed by the holding in United States Credit Bureau, Inc. v. Claus, 79 Cal.App.2d 85, 179 P.2d 36, 37 (1947). There, the California appellate court found two separate "covenants" based on language in an indemnity agreement that provided the surety with "the right of immediate action ... for any `loss or liability when ... paid, adjusted, incurred or assumed... whether the same shall have been actually paid or not.'" Ibid. It held that those covenants may be treated as separate agreements. Ibid. The plaintiff thus was permitted to maintain an action for recovery of actual loss even though the time had expired for an action to recover on the covenant to indemnify for liability. Id. at 37-38. In Oaks v. Scheifferly, 74 Cal. 478, 16 P. 252 (1887) and in Globe v. Larkin, 62 Cal.App.2d 891, 145 P.2d 633 (1944), the only other instances in which California courts were presented with the issue at bar, the covenants were held to be distinct from each other. The California courts' repeated affirmation of this principle indicates it is well settled there.
The California approach resolves the statute of limitations issue based on sound, fair principles of law. Most importantly, it fulfills the expectations of the parties under the clear terms of their agreement and affords the surety the benefit of its bargain. Defendant admits that the indemnity agreement in question provided FIA protection against both liability and loss. Therefore, defendant cannot claim that he was surprised by FIA's desire to pursue a claim for actual losses sustained by assuming DKA's obligation to the MUA. Quite simply, unlike a suit for indemnification against liability, "[t]his action is for the recovery of actual damages, and could not be maintained if nothing had been paid." Oaks, supra, at 253 (emphasis added). Indeed, a suit against an indemnitor after an indemnitee experiences actual loss is arguably fairer to the indemnitor because the computation of damages in such cases is more precise. On the other hand, when suit is brought by the indemnitee simply because liability has been established the damage claim against the indemnitor may be far less precise because the obligation of the indemnitee to the indemnitor's principal may not yet be fixed. See e.g., Johnson v. Johnson, 92 N.J.Super. 457, 462, 224 A.2d 23 (App.Div.1966); Standard Surety & Casualty Co. of New York v. Caravel Industries Corp., 128 N.J.Eq. 104, 106-07, 15 A.2d 258 (Ch.1940); North v. North & Son, supra, 93 N.J.L. at 442-43, 108 A. 244.
The contractual right to proceed against the indemnitor upon liability being established is for the benefit of the surety. A surety negotiates for that right in recognition of the uncertainty as to whether the contractor and/or indemnitor will have sufficient funds "at some distant day" when the surety's loss has been fixed to *699 satisfy the obligation to the surety. Standard Surety & Casualty, supra, 128 N.J. Eq. at 108, 15 A.2d 258. Thus, the right of the surety to proceed when liability is fixed is usually linked with the obligation of the indemnitor to deposit collateral sufficient to satisfy all expenses, judgments, and losses that the surety may incur in the future as a result of its undertaking under the bond. Ibid. This concept is sometimes referred to as the surety's right of exoneration. Stulz-Sickles Co. v. Fredburn Const. Corporation, 114 N.J.Eq. 475, 477, 169 A. 27 (Ch.1933). Therefore, the surety generally is not interested in obtaining a judgment against the indemnitor for a sum certain when it institutes suit upon incurring a liability. Rather, its interest is to secure the benefit of the indemnitor's promise to post collateral sufficient to cover the surety's anticipated future losses.
There may be times, however, where it may be impractical for the surety to institute suit in reliance on the indemnification against liability. In cases where as here the indemnitors file for bankruptcy protection, the surety's right of exoneration may not be a realistic benefit because the indemnitors' bankruptcy could place the collateral beyond the surety's reach. It would be unfair to the surety in such circumstances to have the statute of limitations begin to run at that time because the sole aim of the indemnity agreement and the expectations of the parties is to make the surety whole on its bond undertaking.
(At the request of the Court, Parts II, III and IV of this opinion have been excluded from publication.)
NOTES
[1] ($973,444.25 (claims-bulky waste) minus $438,734.66 (proceeds-bulky waste)) plus ($3,684,233.56 (claims-landfill) minus $1,716,459.51 (proceeds-landfill)). In plaintiff's statement of material facts, it alleged that the total losses, aside from prejudgment interest, amount to $2,589,167.01 (Ja60). In its calculation of interest, it noted that only $1,638,026.57 and $430,484.23 were applied to the "principal" and the remaining sums were applied against "interest which had accrued as of the date the recovery was received."