The TRAVELERS INDEMNITY COMPANY

v.

DAMMANN & CO., INC. and International Flavors & Fragrances Inc.

Dammann & Co., Inc.

v.

Cooperative Business International, Inc. and Nationwide Mutual Insurance Company

International Flavors & Fragrances Inc., Appellant.

No. 09–1225.

United States Court of Appeals, Third Circuit.

Argued Dec. 2, 2009.

Filed Feb. 5, 2010.

Robert G. Rose (Argued), Day Pitney, Morristown, NJ, for Appellant, International Flavors & Fragrances Inc.

Frank E. Borowsky, Jr. (Argued), Michael J. Frantz, Jr., Borowsky & Borowsky, Shrewsbury, NJ, for Appellee, The Travelers Indemnity Company.

Peter M. Bouton, William H. Mergner, Jr. (Argued), Leary, Bride, Tinker & Mor-

an, Cedar Knolls, NJ, for Appellee, Dammann & Co.

George A. Prutting, Jr. (Argued), Prutting & Lombardi, Audubon, NJ, for Third Party Appellee, Cooperative Business International, Inc.

Richard D. Millet, Richard D. Millet & Associates, Bridgewater, NJ, for Third Party Appellee, Nationwide Mutual Ins. Co.

Before: FISHER, HARDIMAN and STAPLETON, Circuit Judges.

## OPINION OF THE COURT

FISHER, Circuit Judge.

The Travelers Indemnity Company sought a declaration in federal court that it was not obligated to cover any claims asserted against its insured, Dammann & Co., Inc., by International Flavors & Fragrances Inc. ("IFF"). More than three years after Travelers initiated this lawsuit, IFF sought leave to assert various crossclaims against Dammann. The District Court denied that request on futility grounds, concluding that the proposed crossclaims either were time-barred or failed to state a claim. IFF now appeals the District Court's denial of its request. Seeing no abuse of discretion in the District Court's ruling, we will affirm.

## I.

Dammann is a producer of raw foods, including vanilla beans. IFF manufactures, among other things, food and beverage flavoring, including vanilla extract. Dammann agreed, via a written contract, to sell vanilla beans to IFF and delivered shipments in January 2004. IFF incorporated those beans into its vanilla extract, which it later sold to several of its customers. In February 2004, IFF learned that some of the beans may have contained mercury. Subsequent tests confirmed as much. In May 2004, IFF sent a letter to Dammann claiming more than five million dollars in damages in connection with the contaminated beans. Dammann thereafter sought coverage from Travelers, its insurer, for liability arising out of IFF's claim.

In November 2004, Travelers commenced this action by filing a one-count complaint against Dammann and IFF in the United States District Court for the District of New Jersey. Travelers sought a declaration that the insurance policy it had sold to Dammann did not cover IFF's damages claim. Dammann subsequently filed a counterclaim against Travelers, seeking a declaration that Travelers was obligated to cover IFF's claim and asserting additional claims for breach of contract, breach of fiduciary duty, and breach of the duty of good faith and fair dealing. Dammann also filed a third-party complaint against Cooperative Business International, Inc. ("CBI"), and CBI's insurer, Nationwide Mutual Insurance Company. In its third-party complaint, Dammann alleged it had bought the contaminated beans from CBI and sought indemnification from CBI—or from Nationwide—for any liability Dammann might incur as a result of IFF's claim.

In June 2007, Travelers moved for summary judgment on its declaratory judgment claim. The District Court denied that motion, concluding that a portion of IFF's claim was covered by Dammann's insurance policy with Travelers and that another portion was potentially covered by the policy.

In February 2008, IFF sought leave to file crossclaims for breach of express warranty, breach of implied warranty, and product liability against Dammann. Dammann and CBI both opposed the motion. In August 2008, Magistrate Judge Shipp

denied IFF's motion.[1] Judge Shipp noted that IFF's February 2008 request came more than four years after its January 2004 receipt of the beans but less than four years after its February 2004 discovery of the contamination. The Uniform Commercial Code ("U.C.C."), which Judge Shipp determined was applicable, imposes a four-year statute of limitations, *see* U.C.C. § 2–725(1), and provides that a cause of action accrues at the time of the breach except where a warranty expressly extends to future performance, *id.* §§ 2–725(2)(a), (3)(c). Judge Shipp concluded there was no such express extension in IFF's contract with Dammann and that, as a consequence, IFF's breach of warranty crossclaims were untimely. With respect to IFF's product liability crossclaim, Judge Shipp reasoned that it was barred by the economic loss doctrine. Judge Shipp also found that IFF had exhibited undue delay in seeking leave to file crossclaims. For all these reasons, Judge Shipp denied IFF's motion.

IFF appealed Judge Shipp's ruling to the District Court. Before the District Court disposed of that appeal, IFF filed a brief "in further support" of its appeal. In that supplemental brief, IFF reiterated its challenge to Judge Shipp's ruling and sought permission to assert not only the breach of express warranty, breach of implied warranty, and product liability crossclaims it had previously sought to assert, but also express indemnification and implied indemnification crossclaims, all against Dammann.

In October 2008, Travelers and Dammann stipulated to the dismissal of each other's claims.

In November 2008, the District Court held a hearing on IFF's appeal of Judge Shipp's ruling and its request to file additional crossclaims. In December 2008, the District Court rejected IFF's appeal and denied its request to assert any crossclaims, concluding they were futile because they were either time-barred or insufficiently pled. *Travelers Indem. Co. v. Dammann & Co., Inc.*, 592 F.Supp.2d 752 (D.N.J.2008). The District Court did not address Judge Shipp's finding that IFF had unduly delayed in seeking leave to assert crossclaims.

This timely appeal followed. On appeal, IFF argues that it should have been permitted to proceed on its product liability as well as express and implied indemnification crossclaims. IFF does not challenge the District Court's denial of its request to assert breach of express and implied warranty crossclaims.

## II.

■■■ The District Court had jurisdiction under 28 U.S.C. § 1332. We have jurisdiction under 28 U.S.C. § 1291.[2] We

1. After the defendants filed oppositions to IFF's motion, IFF filed a reply brief stating that it was "agreeable" to withdrawing its proposed crossclaims for breach of express and implied warranties. (App. 207.) Judge Shipp denied IFF's motion notwithstanding IFF's indication of willingness to withdraw its breach of warranty crossclaims.

2. After this appeal was docketed, the Clerk of this Court advised the parties that this appeal was subject to possible dismissal on the ground that the District Court's order denying IFF's request for leave to assert crossclaims

was not a final order within the meaning of 28 U.S.C. § 1291. In response, IFF submitted a letter stating that the District Court, following the filing of the notice of appeal, had entered an order stating that its ruling on IFF's request for leave to file crossclaims "was a final order for purposes of appeal, and that all remaining claims, counterclaims and cross-claims in this matter are rendered moot[.]" Travelers, Dammann and Nationwide have all submitted separate letters concurring that there are no issues pending before the District Court. Having considered

review a district court's denial of a request for leave to file new claims for abuse of discretion. *See Winer Family Trust v. Queen*, 503 F.3d 319, 325 (3d Cir.2007).[3] " 'Futility' means that the complaint, as amended, would fail to state a claim upon which relief could be granted." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir.1997) (citation omitted). In determining whether a claim would be futile, "the district court applies the same standard of legal sufficiency as applies under [Federal] Rule [of Civil Procedure] 12(b)(6)." *Id.* (citation omitted). "[I]f a district court concludes that an amendment is futile based upon its erroneous view of the law, it abuses its discretion." *Abbott v. Latshaw*, 164 F.3d 141, 149 (3d Cir.1998) (quotation marks and citation omitted); *see also Smith v. NCAA*, 139 F.3d 180, 190 (3d Cir.1998) ("If a district court concludes that an amendment is futile based upon its erroneous view of the law, it abuses its discretion in denying a plaintiff leave to amend to include a legally sufficient allegation." (citation omitted)), *vacated on other grounds*, 525 U.S. 459, 119 S.Ct. 924, 142 L.Ed.2d 929 (1999).

## III.

### A. IFF's Proposed Product Liability Crossclaim

■ IFF argues that the District Court erred in denying its request to assert a product liability crossclaim. The District Court agreed with Judge Shipp that IFF's crossclaim sounded in contract and thus was governed by the U.C.C. and its four-year statute of limitations. The Court rejected IFF's contention that its crossclaim sounded in tort and was therefore governed by the New Jersey Product Liability Act ("NJPLA"), N.J. Stat. Ann. § 2A:58C–1 *et seq.*, and New Jersey's accompanying six-year statute of limitations for tort claims. *See* N.J. Stat. Ann. § 2A:14–1.[4] In making these determinations, the District Court reviewed New Jersey's economic loss doctrine. While recognizing that New Jersey law was unsettled on this point, the District Court, after surveying the law in other jurisdictions, predicted that the Supreme Court of New Jersey would interpret that doctrine to bar tort claims where a plaintiff seeks economic

the matter independently, *see Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514, 126 S.Ct. 1235, 163 L.Ed.2d 1097 (2006) (noting that "courts ... have an independent obligation to determine whether subject-matter jurisdiction exists"), we perceive no impediment to this Court's exercise of jurisdiction.

3. IFF asserts in its opening brief that we should exercise plenary review over the District Court's denial of its request, and is not the first litigant to do so in this Court. *See, e.g., Bjorgung v. Whitetail Resort, LP*, 550 F.3d 263, 266 n. 3 (3d Cir.2008) ("Bjorgung appears to argue, *incorrectly*, that [the decision refusing leave to amend] is subject to *de novo* review." (first emphasis supplied)). The cases IFF cites do not stand for that proposition. We have unwaveringly applied an abuse-of-discretion standard to the denial of a request for leave to amend a pleading. *See, e.g., Metcalfe v. Renaissance Marine, Inc.*, 566 F.3d

324, 337 (3d Cir.2009); *Kanter v. Barella*, 489 F.3d 170, 181–182 (3d Cir.2007). In fact, we have rejected the very proposition that IFF now appears to press:

> Plaintiffs contend that the applicable standard of review of futility determinations is *de novo*, relying upon our decision in [*In re Burlington Coat Factory Securities Litigation*, 114 F.3d 1410 (3d Cir.1997)], as adopting the standard employed by several of our sister courts of appeals, but we do need read *Burlington* as having done so. . . . Accordingly, we decline the plaintiffs' invitation to chart a new course and consider the District Court's finding of futility for abuse of discretion.

*In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 281 n. 13 (3d Cir.2004).

4. The parties agree that New Jersey law governs this case.

damages for foreseeable losses for which the plaintiff could have contractually allocated risk. Concluding that IFF was just such a plaintiff, the District Court reasoned that the economic loss doctrine barred application of the NJPLA in this case.

Under the NJPLA, "[a] manufacturer or seller of a product shall be liable in a product liability action only if the claimant proves by a preponderance of the evidence that the product causing the harm was not reasonably fit, suitable or safe for its intended purpose[.]" N.J. Stat. Ann. § 2A:58C–2.[5] The statute defines "harm," in pertinent part, as "physical damage to property, other than to the product itself[.]" N.J. Stat. Ann. § 2A:58C–1(b)(2)(a). While the NJPLA defines "harm," it does not explain the meaning of "physical damage to property, other than to the product itself." No New Jersey court has delineated the contours of "the product itself" and "other property" as contemplated by the NJPLA.

■■■ Under New Jersey law, the economic loss doctrine "defines the boundary between the overlapping theories of tort law and contract law by barring the recovery of purely economic loss in tort, particularly in strict liability and negligence cases." *Dean v. Barrett Homes, Inc.*, 406 N.J.Super. 453, 968 A.2d 192, 202 (2009) (quotation marks and citation omitted), *cert. granted*, 200 N.J. 207, 976 A.2d 384 (2009). "The purpose of the rule is to strike an equitable balance between countervailing public policies[ ] that exist in tort and contracts law." *Id.* (internal quotation marks and citation omitted).

■■■ Neither the Supreme Court of New Jersey nor any other New Jersey court has directly clarified the interaction between the NJPLA and the economic loss doctrine. In other words, no New Jersey case specifically says whether the sort of claim IFF alleges here is governed by contract or tort principles. As a consequence, we must predict how the New Jersey Supreme Court would resolve this case. *See Hunt v. United States Tobacco Co.*, 538 F.3d 217, 220 (3d Cir.2008) ("[I]n the absence of any clear precedent of the state's highest court, we must predict how that court would resolve the issue." (quotation marks, other alteration and citation omitted)). "In making such a prediction, we ... consider relevant state precedents, analogous decisions, considered dicta, scholarly works, and any other reliable data tending convincingly to show how the highest court in the state would resolve the issue at hand." *Id.* at 221. (quotation marks and citation omitted). Furthermore, in the absence of direct authority from the New Jersey Supreme Court, we may treat as persuasive authority decisions of the Appellate Division of the Superior Court of New Jersey. *See Edwards v. HOVENSA, LLC*, 497 F.3d 355, 361 (3d Cir.2007) ("[A]n intermediate appellate state court is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.") (quotation marks and ellipsis omitted) (quoting *West v. AT & T Co.*, 311 U.S. 223, 237, 61 S.Ct. 179, 85 L.Ed. 139 (1940)).

---

5. The New Jersey Legislature enacted the NJPLA in light of its finding that "there is an urgent need for remedial legislation to establish clear rules with respect to certain matters relating to actions for damages for harm caused by products, including certain principles under which liability is imposed and the standards and procedures for the award of punitive damages." N.J. Stat. Ann. § 2A:58C–1(a). Notwithstanding the Legislature's objective, as we shall see, the statute in fact obscures more than it elucidates, especially when juxtaposed with other elements of New Jersey law.

The New Jersey courts have long recognized that while "[a] tort action is separate and distinct from a contract action[,]" *Huck v. Gabriel Realty,* 136 N.J.Super. 468, 346 A.2d 628, 632 (N.J.Super. Ct. Law Div.1975) (citation omitted), "[t]he boundary line between tort and contract actions is not capable of clear demarcation." *New Mea Constr. Corp. v. Harper,* 203 N.J.Super. 486, 497 A.2d 534, 538 (1985), *cited with approval in Saltiel v. GSI Consultants, Inc.,* 170 N.J. 297, 788 A.2d 268, 276 (2002). The interplay between tort and contract law in New Jersey has undergone significant changes over the last several decades. In *Santor v. A & M Karagheusian, Inc.,* 44 N.J. 52, 207 A.2d 305 (1965), the New Jersey Supreme Court held that a purchaser could maintain a strict liability claim seeking economic loss against the manufacturer of a defective product. The Court acknowledged that its holding implicitly allowed tort law to invade what had previously been exclusively contractual territory, but reasoned that a consumer would otherwise have no remedy in contract against a manufacturer with which he was not in privity. Thus, the Court concluded that allowing the consumer to bring an action in tort would supply a remedy where contract law provided none.

Two decades later, the New Jersey Supreme Court rejected the rationale of *Santor,* at least in the commercial, as opposed to consumer, context, in *Spring Motors Distributors, Inc. v. Ford Motor Compa-* *ny,* 98 N.J. 555, 489 A.2d 660 (1985), where a purchaser of trucks sued the dealer and the manufacturer of the trucks as well as the supplier of the transmissions after the trucks failed to operate properly because of defects in the transmissions.[6] The Court held, among other things, that the purchaser could not assert a strict liability claim against the manufacturer or the supplier for economic loss. *See id.* at 663 ("[A] commercial buyer seeking damages for economic loss resulting from the purchase of defective goods may recover from an immediate seller and a remote supplier in a distributive chain for breach of warranty under the U.C.C., but not in strict liability or negligence."). The Court noted that, "[a]s a general rule, the rights and duties of a buyer and seller are determined by ... the U.C.C.[,]" while "strict liability evolved as a judicial response to inadequacies in sales law with respect to consumers who sustained physical injuries from defective goods made or distributed by remote parties in the marketing chain." *Id.* at 670. Explaining that "[t]he considerations that give rise to strict liability do not obtain between commercial parties with comparable bargaining power" and that "a commercial buyer ... may be better situated than the manufacturer to factor into its price the risk of economic loss caused by the purchase of a defective product[,]" the Court concluded that, "[a]s between commercial parties, ... the allocation of risks in accordance with their

---

6. The *Spring Motors* Court took stock of the wave of criticism leveled at the *Santor* ruling by both courts and commentators. *See Spring Motors,* 489 A.2d at 669–70; *see also Alloway v. Gen. Marine Indus.,* 149 N.J. 620, 695 A.2d 264, 269 (1997) (calling *Santor* an "unprecedented result"). Despite that criticism, the *Spring Motors* Court did not overrule *Santor* to the extent it held that a *"consumer* may recover in strict liability for direct economic loss." *Spring Motors,* 489 A.2d at 670 (emphasis added). Slightly more than one year after *Spring Motors,* the United States Supreme Court expressly disapproved *Santor,* describing it as a "minority view [that] fails to account for the need to keep products liability and contract law in separate spheres and to maintain a realistic limitation on damages." *E. River S.S. Corp. v. Transamerica Delaval, Inc.,* 476 U.S. 858, 870–71, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986). *Santor's* vitality is highly questionable post-*East River. See Paramount Aviation Corp. v. Gruppo Agusta,* 288 F.3d 67, 77 (3d Cir.2002).

agreement better serves the public interest than an allocation achieved as a matter of policy without reference to that agreement." *Id.* at 670–71. In reaching that conclusion, the Court "turn[ed] to the structure and purpose of the [U.C.C.], which[,]" it observed, "constitutes a comprehensive system for determining the rights and duties of buyers and sellers with respect to contracts for the sale of goods." *Id.* at 665 (citation omitted). That structure and purpose, the Court reasoned, reflected

> the principle that parties should be free to make contracts of their choice, including contracts disclaiming liability for breach of warranty. Once they reach such an agreement, society has an interest in seeing that the agreement is fulfilled. Consequently, the U.C.C. is the more appropriate vehicle for resolving commercial disputes arising out of business transactions between persons in a distributive chain.

*Id.* at 668. In the New Jersey Supreme Court's view, allowing the truck purchaser to sue in tort would "would dislocate major provisions of the [U.C.C.]" by "obviat[ing] the statutory requirement that a buyer give notice of a breach of warranty" and "depriv[ing] the seller of the ability to exclude or limit its liability[.]" *Id.* at 671 (citations omitted). "In sum," the Court wrote, "the U.C.C. represents a comprehensive statutory scheme that satisfies the needs of the world of commerce, and courts should pause before extending judicial doctrines that might dislocate the legislative structure." *Id.*

The New Jersey Supreme Court revisited and expanded on these principles more than two decades later in *Alloway v. General Marine Industries*, 149 N.J. 620, 695 A.2d 264 (1997), where a non-commercial purchaser of a faulty boat sued the dealer and the manufacturer for economic loss.

The Court explained that while "tort principles are better suited to resolve claims for personal injuries or damage to other property[,] . . . [c]ontract principles more readily respond to claims for economic loss caused by damage to the product itself." *Id.* at 267–68 (citations omitted). Put another way, "[t]ort principles more adequately address the creation of an unreasonable risk of harm when a person or other property sustains accidental or unexpected injury[,]" while "contract principles, particularly as implemented by the U.C.C., provide a more appropriate analytical framework" where "a product fails to fulfill a purchaser's economic expectations[.]" *Id.* at 268 (citations omitted). "Implicit in the distinction[,]" the Court observed, "is the doctrine that a tort duty of care protects against the risk of accidental harm and a contractual duty preserves the satisfaction of consensual obligations." *Id.* (citations omitted). Also relevant to the distinction between contract and tort, the *Alloway* Court said, "are the relative bargaining power of the parties and the allocation of the loss to the better risk-bearer in a modern marketing system." *Id.* (internal quotation marks and citations omitted). The Court was likewise concerned with respecting legislative commands. By enacting the U.C.C. into New Jersey law, "the [New Jersey] Legislature adopted a comprehensive system for compensating consumers for economic loss arising from the purchase of defective products." *Id.* (citations omitted). Importantly, the Court wrote, reiterating its statements in *Spring Motors*, the U.C.C., which provides a broad panoply of contractual protections, must be liberally construed so as "promote [its] underlying purposes and policies." *Id.* at 269 (citation omitted). Finding that the purchaser of the boat had "insured against the risk that gave rise to his economic loss" by contractually protecting itself and noting "the unfairness of imposing on a

seller tort liability for economic loss[,]" the Court held that the purchaser's tort claims were barred by the economic loss doctrine. *Id.* at 275.[7]

Although *Spring Motors* and *Alloway* plainly disfavor the application of tort law in what is an otherwise clearly contractual context, neither case addresses the circumstance where, as here, a buyer has entered into a contract—which includes contractual protection in the form of indemnification and warranty clauses—with a seller of an allegedly defective product that causes damage not only to the product itself but to something other than the product itself. Here, the product itself is the vanilla beans IFF bought from Dammann. The "other property" that was allegedly damaged is IFF's other flavoring products it mixed with the contaminated beans as well as the machinery it used to manufacture vanilla extract.

▇ We cannot help but note, as we analyze this case, what appears to be a

tension between the economic loss doctrine and the NJPLA. Specifically, the economic loss doctrine precludes tort claims for purely economic loss without reference to whether the loss stems from damage to "the product itself" or "other property." At the same time, the NJPLA clearly permits a plaintiff to pursue a tort remedy in the event of harm to "other property" without reference to New Jersey's preference for keeping tort out of contract's hair. The New Jersey Supreme Court has not had occasion to harmonize that apparent tension, *see, e.g., Alloway,* 695 A.2d at 273 (declining to resolve the issue "whether the U.C.C. or tort law should apply when a defective product poses a serious risk to other property or persons, but has caused only economic loss to the product itself"); *see also id.* at 267 (noting that the plaintiffs "do not allege that *other property* was damaged"), and no other New Jersey court has done so either. Given the lack of a clear directive, "[o]ur function is to

---

**7.** In *Goldson v. Carver Boat Corporation,* 309 N.J.Super. 384, 707 A.2d 193 (1998), the Appellate Division affirmed the dismissal of product liability and negligence claims against the seller of a luxury yacht and against a company that had installed the yacht's engine, echoing the *Spring Motors* and *Alloway* Courts' pronouncements while reasoning as follows:

> Product liability grew out of a public policy judgment that people need more protection from dangerous products than may be afforded by the law of contracts and warranties. The traditional contract is the result of free bargaining of parties who are brought together by the play of the market, and who meet each other on a footing of approximate economic equality. But other concerns exist where the buyer has no real freedom of choice and the manufacturer uses its grossly disproportionate bargaining power to introduce into the stream of commerce an instrumentality that, because of its defective design or construction, poses a grave danger of injury to other persons or property.

*Id.* at 199–200 (internal quotation marks and citations omitted). Based on these principles, the *Goldson* Court concluded that "where, as here, the consumer is not at a genuine commercial disadvantage, there is greater reason to allow allocation of the loss caused by a defective product to reflect the interplay of forces in the marketplace," and that, "[i]n such a case, the parties are able to allocate among themselves both the benefits and risks that inhere in their mutual promises." *Id.* at 200; *accord Dean,* 968 A.2d at 203 ("[T]he policy behind contract law operates on the premise that contracting parties, in the course of bargaining for terms of a sale, are able to allocate risks and costs of the potential nonperformance. The underlying assumption is that the contract is the result of an arms-length negotiated transaction." (internal quotation marks and citation omitted)); *Marrone v. Greer & Polman Constr., Inc.,* 405 N.J.Super. 288, 964 A.2d 330, 339–40 (N.J.Super.Ct.App.Div.2009).

look, as best we can, into the minds of the members of the [New Jersey] Supreme Court, and to ascertain their likely disposition of this case." *Kramer v. Thompson,* 947 F.2d 666, 677 (3d Cir.1991). Although this prediction is not an easy one, *see Yohannon v. Keene Corp.,* 924 F.2d 1255, 1264 (3d Cir.1991) (noting "[t]he inherently difficult task of predicting what a state supreme court will do when the state's decisional law is unclear on the point at issue"), we do not write on an entirely blank slate. Based on the available case law in New Jersey, we are convinced that the New Jersey Supreme Court would not permit IFF to pursue its product liability claim under the circumstances presented here.

While we have recognized that "[t]he New Jersey Supreme Court has long been a leader in expanding tort liability[,]" *Hakimoglu v. Trump Taj Mahal Assocs.,* 70 F.3d 291, 295 (3d Cir.1995), we have also read *Spring* and *Alloway* as reflective of New Jersey's strong resistance to the usurpation of contract law by tort law:

> *Spring Motors* and *Alloway* reflect a deference to legislative will where the legislature has provided a comprehensive scheme controlling the relationship between the parties and, more specifically, a recognition of the importance of the allocation of risk of economic loss against the background of the rights and remedies provided by the U.C.C. ... [A]s far as parties (whether commercial or non-commercial) within the distribution chain of goods are concerned, the U.C.C. alone controls the liability of a seller of goods for economic loss arising as a result of a defect in those goods; there is, accordingly, no liability in a tort action whether it be one asserting strict liability or negligence.

*Paramount Aviation Corp. v. Gruppo Agusta,* 288 F.3d 67, 73 (3d Cir.2002). Indeed, these principles are at the very root of the economic loss doctrine. *See Werwinski v. Ford Motor Co.,* 286 F.3d 661, 680 (3d Cir.2002) (Pennsylvania law); *Cooper Power Sys., Inc. v. Union Carbide Chems. & Plastics Co., Inc.,* 123 F.3d 675, 681–82 (7th Cir.1997) (Wisconsin law). In keeping with the purpose of the economic loss doctrine, New Jersey courts have consistently held that contract law is better suited to resolve disputes between parties where a plaintiff alleges direct and consequential losses that were within the contemplation of sophisticated business entities with equal bargaining power and that could have been the subject of their negotiations. *See Alloway,* 695 A.2d at 268, 275; *Spring Motors,* 489 A.2d at 666, 670–71; *Dean,* 968 A.2d at 203–04; *Menorah Chapels at Millburn v. Needle,* 386 N.J.Super. 100, 899 A.2d 316, 323–25 (2006); *Goldson,* 707 A.2d at 200.

Here, the record is bereft of any indication that IFF and Dammann are anything other than sophisticated players on equal footing. *Cf. Alloway,* 695 A.2d at 268 (noting that "nothing indicates that Alloway was at a disadvantage when bargaining for the purchase of the boat"). Furthermore, the damages IFF alleges in its proposed product liability crossclaim include: the scrapping of contaminated finished flavoring products; claims from customers who bought those products; testing costs; plant cleaning costs; internal labor and administrative costs; and lost profits. (App. 303.) In *Alloway,* the New Jersey Supreme Court observed that "economic loss encompasses actions for the recovery of damages for costs of repair, replacement of defective goods, inadequate value, and consequential loss of profits" as well as "the diminution in value of the product because it is inferior in quality and does not work for the general purposes for which it was manufactured and sold." 695 A.2d at 267 (quotation marks and citations

omitted). Significantly, IFF's alleged damages fall squarely within the ambit of economic losses the *Alloway* Court described and that are generally regarded as both direct and consequential damages recoverable in contract. *See Spring Motors*, 489 A.2d at 665 ("A direct economic loss includes the loss of the benefit of the bargain, *i.e.*, the difference between the value of the product as represented and its value in its defective condition. Consequential economic loss includes ... indirect losses[.]" (citation omitted)); *see also* 24 Richard A. Lord, *Williston on Contracts* § 64:12 (4th ed.2002) (defining general damages as "damages that would follow any breach of similar character in the usual course of events" and consequential damages as "damages that ... were reasonably foreseeable or contemplated by the parties at the time the contract was entered into as a probable result of a breach"). In fact, those damages are precisely the sort the U.C.C., as incorporated into New Jersey law, authorizes a buyer to recoup when a seller breaches a contract by selling a defective product. *See* N.J. Stat. Ann. § 12A:2–715 (defining incidental damages as, among other things, "any commercially reasonable charges, expenses or commissions in connection with effecting cover and *any other reasonable expense incident to the delay or other breach*" and consequential damages as "any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise[.]" (emphasis supplied)).

To allow IFF to pursue tort remedies for its alleged damages—damages for which the U.C.C. permits recovery and for which IFF could have contractually shielded itself—would effectively authorize duplicative recovery, a result the New Jersey Supreme Court has specifically criticized.

*See Alloway*, 695 A.2d at 275 ("[A] tort cause of action for economic loss duplicating the one provided by the U.C.C. is superfluous and counterproductive."). Moreover, "the U.C.C.'s underlying purposes and policies[,]" *id.* at 269, militate against the availability of a tort remedy for IFF's product liability claim. The availability of a tort remedy in a case such as this would encourage buyers like IFF to forgo contractual protection in exchange for a lesser purchase price. Such an approach would yield results that conflict with the economic loss doctrine's very purpose, as recognized in New Jersey jurisprudence. *See, e.g., id.* at 270 ("Allowing recovery for all foreseeable damages in claims seeking purely economic loss, could subject a manufacturer to liability for vast sums arising from the expectations of parties downstream in the chain of distribution." (citation omitted)); *Dean*, 968 A.2d at 203 ("By refusing to extricate parties from the bargains that they have struck, the economic loss rule encourages parties to consider the possibility that the product will not perform properly and either assign risk or negotiate the price accordingly." (quotation marks, alteration and citation omitted)). Such an outcome would also be particularly anomalous where, as here, the parties did in fact include such protection in their contract in the form of indemnification and warranty clauses, thus evidencing their ability to negotiate and to provide for the allocation of risk and the limitation of liability. *Cf. Alloway*, 695 A.2d at 269 (listing the various ways in which buyers and sellers may allocate risk and limit their liability under the U.C.C.); *see also id.* at 268 (noting that "Alloway prudently protected himself against the risk of loss by obtaining an insurance policy that distributed that risk to his insurer"). In sum, based on the trend in New Jersey jurisprudence, starting with *Santor* and fol-

lowed by *Spring Motors* and *Alloway,* as well as the nature of the damages IFF alleges to have suffered, we predict that the New Jersey Supreme Court would bar IFF's product liability crossclaim under the economic loss doctrine.

We find support for our conclusion in the law of other jurisdictions. Indeed, our reference to other jurisdictions for guidance in the absence of clear authority in New Jersey law is in harmony with the New Jersey Supreme Court's own approach under similar circumstances. *See, e.g., Saltiel,* 788 A.2d at 276–77; *Cox v. RKA Corp.,* 164 N.J. 487, 753 A.2d 1112, 1118–27 (N.J.2000) (considering other jurisdictions' laws where there was "no reported New Jersey case addressing the issue precisely"); *Thomas Group v. Wharton Senior Citizen Hous., Inc.,* 163 N.J. 507, 750 A.2d 743, 748–49 (2000) (similar). We note as well that, although perhaps not true in all instances, the New Jersey Supreme Court has frequently adopted what it has regarded as the majority rule among other jurisdictions when New Jersey law has not furnished a clear rule of decision. *See, e.g., State v. Korecky,* 169 N.J. 364, 777 A.2d 927, 933–34 (2001); *Saffer v. Willoughby,* 143 N.J. 256, 670 A.2d 527, 534 (1996); *State v. Haliski,* 140 N.J. 1, 656 A.2d 1246, 1252 (1995); *Paul Revere Life Ins. Co. v. Haas,* 137 N.J. 190, 644 A.2d 1098, 1105–06 (1994); *Bandel v. Friedrich,* 122 N.J. 235, 584 A.2d 800, 802–03 (1991); *Kazmer–Standish Consultants, Inc. v. Schoeffel Instruments Corp.,* 89 N.J. 286, 445 A.2d 1149, 1152–53 (1982) (adopting and modifying the majority rule); *Tortorello v. Reinfeld,* 6 N.J. 58, 77 A.2d 240, 243–44 (1950); *see also, e.g., W9/PHC Real Estate LP v. Farm Family Cas. Ins. Co.,* 407 N.J.Super. 177, 970 A.2d 382, 397–98 (2009); *Custom Commc'ns Eng'g, Inc. v. E.F. Johnson Co.,* 269 N.J.Super. 531, 636 A.2d 80, 84 (1993).

There exists a split of authority among other jurisdictions regarding the meaning of "other property" in the context of the economic loss doctrine. The majority of jurisdictions employ some variation of a test under which "tort remedies are unavailable for property damage experienced by the owner where the damage was a foreseeable result of a defect at the time the parties contractually determined their respective exposure to risk, regardless whether the damage was to the 'goods' themselves or to 'other property.'" *Dakota Gasification Co. v. Pascoe Bldg. Sys.,* 91 F.3d 1094, 1099 (8th Cir.1996) (predicting that North Dakota would adopt the modern trend); *see also Grams v. Milk Prods., Inc.,* 283 Wis.2d 511, 699 N.W.2d 167, 178 (2005); *In re Consol. Vista Hills Retaining Wall Litig.,* 119 N.M. 542, 893 P.2d 438, 446 (1995); *Neibarger v. Universal Coops. Inc.,* 439 Mich. 512, 486 N.W.2d 612, 620 (1992); *Hapka v. Paquin Farms,* 458 N.W.2d 683, 688 (Minn.1990); *see also, e.g., Palmetto Linen Serv., Inc. v. U.N.X., Inc.,* 205 F.3d 126, 129–30 (4th Cir.2000) (interpreting South Carolina law); *Redman v. John D. Brush & Co.,* 111 F.3d 1174, 1182–83 (4th Cir.1997) (interpreting Virginia law); *see also* Reeder R. Fox & Patrick J. Loftus, *Riding the Choppy Waters of East River: Economic Loss Doctrine Ten Years Later,* 64 Def. Counsel J. 260, 265 (1997) (noting the "growing trend in many jurisdictions to interpret 'economic loss' broadly to include damage that formerly was considered 'other property'" (footnote omitted)). The minority of jurisdictions have taken a different tack. *See, e.g., Elite Prof'ls, Inc. v. Carrier Corp.,* 16 Kan.App.2d 625, 827 P.2d 1195, 1202 (1992) (holding that a trucking company could recover in tort for meat that spoiled when a refrigeration unit it had bought from the defendant malfunctioned because the meat constituted "harm to property other than the refrigeration unit itself"); *Salt River*

*Project Agric. Improvement & Power Dist. v. Westinghouse Elec. Corp.*, 143 Ariz. 368, 694 P.2d 198, 208 (1984) (holding that a plaintiff could pursue a strict liability tort claim against the manufacturer of a device, installed in a previously purchased turbine, that malfunctioned, causing the turbine to catch fire and be destroyed).

The New Jersey Supreme Court's clear rejection of an approach that would allow tort law to substitute for contract law in cases involving sophisticated parties with equal bargaining power is strongly resonant of the rationale of those jurisdictions espousing the majority rule. In *Grams v. Milk Products, Inc.*, for instance, the Wisconsin Supreme Court rejected the plaintiffs' proposal to adopt "a new 'bright line rule,' that physical damage to anything other than the product itself would be considered damage to 'other property' and therefore subject to suit in tort[.]" 699 N.W.2d at 178. The Wisconsin Supreme Court noted the plaintiffs' concession that their proposal would permit tort suits "whenever damage extends beyond the physical dimensions of the purchased product." *Id.* The court declined to adopt such a rule because it "would reject inquiry into the scope of the bargain and replace it with an overly formalistic distinction based on the kind of property harmed[,] ... would inevitably cause the erosion of the [U.C.C.,]" and would undermine "[t]he fundamental distinction between contract and tort[.]" (internal quotation marks omitted). Similarly, in *Neibarger v. Universal Cooperatives, Inc.*, the Michigan Supreme Court reasoned that

> [t]he proper approach requires consideration of the underlying policies of tort and contract law as well as the nature of

the damages. The essence of a warranty action under the [U.C.C.] is that the product was not of the quality expected by the buyer or promised by the seller. The standard of quality must be defined by the purpose of the product, the uses for which it was intended, and the agreement of the parties. In many cases, failure of the product to perform as expected will necessarily cause damage to other property; such damage is often not beyond the contemplation of the parties to the agreement. Damage to property, where it is the result of a commercial transaction otherwise within the ambit of the [U.C.C.], should not preclude application of the economic loss doctrine where such property damage necessarily results from the delivery of a product of poor quality.

486 N.W.2d at 620 (footnotes omitted).

Although by no means dispositive of our inquiry on its own, the fact that New Jersey courts have unequivocally stated their opposition to tort law's encroachment into the contractual domain fortifies the proposition that the New Jersey Supreme Court would endorse the view followed by the majority of jurisdictions. We recognize, of course, that New Jersey has a legislative mandate under the NJPLA to treat harm to "other property" differently from harm to "the product itself," while the "other property" exception in many other jurisdictions is a creature of judicial making. *See, e.g., Moransais v. Heathman*, 744 So.2d 973, 979 (Fla.1999). We see no principled reason, however, why a legislatively-created "other property" exception should be interpreted any differently from its judicially-created counterpart.[8] In short,

---

8. It might be argued, of course, that a court is more at liberty to work around a judicially-created doctrine than a legislative act, which a court must do its utmost to respect and enforce. Whatever the merit of that argument, it is not relevant here, as we are not ignoring the NJPLA's "other property" exception. Instead, we seek to reconcile two seemingly conflicting strains of New Jersey law to

the progression in New Jersey case law from *Santor* to *Spring Motors* and *Alloway* offers compelling evidence that the New Jersey Supreme Court has plotted a course straight for some adaptation of the majority view but simply has not yet taken the final steps over the finish line. *Cf. McKenna v. Ortho Pharmaceutical Corp.*, 622 F.2d 657, 662 (3d Cir.1980) ("[R]elevant state precedents must be scrutinized with an eye toward the broad policies that informed those adjudications, and to the doctrinal trends which they evince." (footnote omitted)). IFF has shown us no relevant legal authority on the basis of which to conclude that New Jersey would shun the majority rule.[9]

To support its view that the beans it bought from Dammann constitute "the product itself" while the vanilla extract and other flavoring products mixed with the beans to make the extract constitute "other property," IFF points us to a series of cases from both the Supreme Court, *see E. River S.S. Corp. v. Transamerica Delaval,* *Inc.*, 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986); *Saratoga Fishing Co. v. J.M. Martinac & Co.*, 520 U.S. 875, 117 S.Ct. 1783, 138 L.Ed.2d 76 (1997), and this Court, *see Sea–Land Serv., Inc. v. Gen. Elec. Co.*, 134 F.3d 149 (3d Cir.1998); *2–J Corp. v. Tice*, 126 F.3d 539 (3d Cir.1997). We reject IFF's reliance on these cases for several reasons. First, none of those cases construes New Jersey law, as we are bound to do in this case. (*East River* and *Saratoga* were admiralty cases while *Sea–Land* and *2–J Corp.* interpreted Pennsylvania law). Second, those cases are all component parts cases. In such cases, it is well-settled law that the buyer of a finished product cannot maintain a tort claim against the manufacturer if one of the finished product's components is defective and causes damage to other parts of the product. *See, e.g., Easling v. Glen–Gery Corp.*, 804 F.Supp. 585, 590 (D.N.J. 1992) (holding that the plaintiffs, who bought a fully-built apartment complex and not "a load of bricks," could not bring tort claims for damage caused by faulty

---

the best of our ability given all available, relevant data.

9. Our decision in *In re Merritt Logan, Inc.*, 901 F.2d 349 (3d Cir.1990), is not to the contrary. In that case, Merritt Logan, a grocery store operator, sued the seller, installer and manufacturer of a defective refrigeration system. We vacated a jury verdict for Merritt Logan on its negligence claim, reasoning that Merritt Logan, like the *Spring Motors* plaintiff, was "seeking damages for economic loss resulting from its purchase of a defective product." *Id.* at 362. We rejected Merritt Logan's argument that it could nevertheless pursue its negligence claim "because the defective refrigeration system caused damage to other property, namely, food stocks." *Id.* We concluded that New Jersey, in light of *Spring Motors*, would restrict Merritt Logan's recovery to that available in contract. We noted that "[i]f New Jersey followed the rule described in [*East River Steamship Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986) ], that an

injured party may recover in tort when the defective product causes damage to property other than the product itself, Merritt Logan's argument would be plausible." *Id.* at 362–63 (footnote and citation omitted). We stated our belief that "*Spring Motors* rejects this rationale in the context of actions between parties to contracts for the sale of goods in favor of the U.C.C. rule permitting consequential damages, including direct economic damage to other property, unless the parties' contract of sale excludes consequential damages." *Id.* at 363. *Merritt Logan* does not govern the outcome here. First, our reference to *East River* was dictum and therefore does not bind us. *See, e.g., Curley v. Klem*, 499 F.3d 199, 210 (3d Cir.2007). Second, *Merritt Logan* did not consider the effect of the NJPLA, which, significantly, expressly authorizes tort recovery in the event of damage to "other property." In other words, *Merritt Logan*'s predictive task, unlike ours, entailed no analysis of the relationship between the economic loss doctrine and the NJPLA.

bricks to the mortar or to other parts of the complex), *cited with approval in Dean,* 968 A.2d at 201. Significantly, IFF is not attempting to sue the manufacturer of one component of a vanilla bean. Rather, IFF wishes to sue the manufacturer of the entire vanilla bean. We think that factual distinction makes component parts cases legally inapposite to this case. Finally, to the extent IFF asks us to predict that the New Jersey Supreme Court would give the phrase "other property" in the NJPLA the inflexible definition IFF advocates, we decline to do so. As noted earlier, such an approach would promote the displacement of contract law by tort law, a result that the New Jersey Supreme Court has specifically disapproved and that we therefore must try to avoid in interpreting the NJPLA.

 One final thought deserves mention. As a federal court sitting in diversity, we are charged with predicting how another court—in this case, the New Jersey Supreme Court—would rule on the record presented to us. Because of the dearth of directly on-point New Jersey case law, this case represents yet another example of how difficult the predictive exercise can be. *See, e.g.,* Dolores K. Sloviter, *A Federal Judge Views Diversity Jurisdiction Through the Lens of Federalism,* 78 Va. L.Rev. 1671, 1679–80 (1992) (cataloguing instances in which this Court has "guessed wrong" in spite of "our best efforts to predict the future thinking of the state supreme courts within our jurisdiction on the basis of all of the available data"). Given that difficulty, in reaching our conclusion we have exercised restraint in accordance with the well-established principle that where "two competing yet sensible interpretations" of state law exist, "we should opt for the interpretation that restricts liability, rather than expands it, until the Supreme Court of [New Jersey] decides differently." *Werwinski,* 286 F.3d at 680 (citations omitted).[10] To hold here, as IFF urges, that the NJPLA governs its product liability crossclaim would undoubtedly subject manufacturers and dealers to greater liability than does our conclusion that the economic loss doctrine precludes that crossclaim. Given the muddled state of New Jersey law on this point, we must decline IFF's invitation. To the extent our conclusion enlarges the scope of contract liability at the expense of tort liability, we believe that approach to be consonant with the direction of available New Jersey law.

Because we predict that the New Jersey Supreme Court would hold that IFF's product liability crossclaim for what is clearly economic loss sounds in contract is therefore barred by the economic loss doctrine, we hold that the District Court did not abuse its discretion in denying IFF's request with respect to that crossclaim and will affirm its ruling in that respect.

### B. IFF's Proposed Express Indemnification Crossclaim

IFF argues that the District Court erred in denying its request to assert an express indemnification crossclaim. In that proposed crossclaim, IFF alleged that its contract with Dammann included two

---

10. *Werwinski* dealt with Pennsylvania law, but the principle it articulated is applicable in any case in which a federal court sits in diversity. *See, e.g., Ashley County v. Pfizer,* 552 F.3d 659, 673 (8th Cir.2009) (narrowly interpreting Arkansas law); *Birchler v. Gehl Co.,* 88 F.3d 518, 521 (7th Cir.1996) (narrowly interpreting Illinois law); *see also Pearson v. John Hancock Mut. Life Ins. Co.,* 979 F.2d 254, 259 (1st Cir.1992) (noting that a plaintiff "cannot justifiably complain if [a] federal court manifests great caution in blazing new state-law trails" (citations omitted)).

express indemnity clauses and that Dammann, despite demand, had refused to indemnify IFF. Under New Jersey Law, express contractual indemnification claims are subject to a six-year statute of limitations. *See* N.J. Stat. Ann. § 2A:14–1; *see also First Indem. of America Ins. Co. v. Kemenash*, 328 N.J.Super. 64, 744 A.2d 691, 696 (2000).

The first clause in the parties' contract, titled "REWORK AND PRODUCT LIABILITY INDEMNIFICATION," provides, in pertinent part: "Seller shall be responsible for claims by third parties against Buyer for loss or damage based on personal injury or destruction of property due to defects in the product for which Seller is responsible." (App. 196.) The second clause, labeled "PERSONAL INJURY AND PROPERTY DAMAGE LIABILITY INDEMNIFICATION," states:

> Seller agrees to defend, indemnify and hold harmless Buyer from all claims, actions, losses, damages and expenses resulting from any injury to persons, damage to property or action by any regulatory agency, arising out of or in any way associated with the design, installation, and/or operation of any production formulation, packaging, or support equipment (including equipment owned by Seller, Buyer or Third Parties), used in the production, processing or handling of the product(s) sold here-

under and all raw materials used in the production[.]

(App. 197.)

The District Court reasoned that an indemnification claim is viable only where the indemnitee seeks to "obtain recovery from the indemnitor for liability incurred to a third party." *Travelers Indem.*, 592 F.Supp.2d at 767 (emphasis omitted). The Court found no authority under New Jersey law to support IFF's position that an indemnitee may sue an indemnitor for damages to the indemnitee itself. Thus, the District Court ruled that IFF's indemnification claim, to the extent it sought such first-party damages, was in fact governed by contract principles and consequently time-barred under the U.C.C.'s four-year statute of limitations.[11] To the extent IFF's proposed express indemnification crossclaim was based on third-party damage, the District Court concluded that IFF had not alleged any such damage. Recognizing that IFF alleged that its customers had sought refunds for the contaminated vanilla extract they had bought, the Court examined the language of the indemnification clauses in IFF's and Dammann's contract and determined that none of the claims asserted by IFF's customers came within the scope of those clauses. Specifically, the Court noted that while one of those clauses allowed for indemnification where a third party suffered personal

---

**11.** In reaching that conclusion, the District Court relied on *Feigenbaum v. Guaracini*, 402 N.J.Super. 7, 952 A.2d 511 (2008), which said that "under a contract of indemnity, the promissor undertakes to protect the promissee against loss or liability to a third person[.]" *Id.* at 518 (internal quotation marks and citation omitted). Nothing in *Feigenbaum*, however, says that indemnification clauses categorically bar first-party claims. No other New Jersey legal authority appears to support that proposition, and no party in this case has pointed us to any such authority.

The District Court also relied on *Titanium Metals Corp. v. Elkem Management, Inc.*, 87 F.Supp.2d 429 (W.D.Pa.1998), but that case is unhelpful here. First, the portion of that case the District Court in this case cited merely parrots *Feigenbaum's* pronouncement that indemnity claims, as a general matter, arise by virtue of the indemnitee's liability to a third party. *See id.* at 430–31. But the general rule does not necessarily preclude an indemnitee from suing its indemnitor for damage the indemnitee itself suffers. Furthermore, *Titanium Metals* interpreted Pennsylvania law, which is not the law governing this case.

injury or property damage due to product defects, IFF had not actually alleged that any of its customers' claims were based on personal injury or property damage. With respect to the other clause, the Court found that IFF had not alleged that "it paid its customers and distributors for claims arising out of the design, installation, or operation of production formulation, packaging or support equipment[,]" *id.* at 768, although, in the Court's view, that clause allowed for indemnification only in the event of such a circumstance. Accordingly, the District Court held that IFF had failed to state an express indemnification claim.

■ Turning first to IFF's express indemnification claim for first-party damages, we, like the District Court, have unearthed no New Jersey case that actually permits an indemnitee to maintain the sort of claim that IFF wishes to assert against Dammann. To support its view, IFF correctly asserts that the word "indemnity" generally enjoys a broad definition. *See* Black's Law Dictionary 783 (8th ed.2004) (defining indemnity as "[a] duty to make good *any* loss, damage, or liability incurred by another" (emphasis added)). To be sure, given the expansive meaning of "indemnity" and New Jersey law's respect for the ability of parties to contract freely, *see Spring Motors,* 489 A.2d at 668 (noting "the principle that parties should be free to make contracts of their choice"); *see also, e.g., Solondz v. Kornmehl,* 317 N.J.Super. 16, 721 A.2d 16, 19 (1998) ("We must enforce the contract which the parties themselves have made." (citations omitted)), we cannot hold that first-party indemnification claims such as the one IFF seeks to maintain are categorically barred as a matter of law in New Jersey absent direct authority to that effect. But we need not presume the existence of such a sweeping rule to conclude that, under the

circumstances presented here, IFF's crossclaim is nevertheless fatally flawed.

■ Under New Jersey law, we must interpret the parties' contract according to its plain language, *see State Troopers Fraternal Ass'n of N.J. v. State,* 149 N.J. 38, 692 A.2d 519, 523 (1997), by "read[ing] the document as a whole in a fair and common sense manner[,]" *Hardy ex rel. Dowdell v. Abdul–Matin,* 198 N.J. 95, 965 A.2d 1165, 1169 (2009) (citation omitted). We must also endeavor to avoid ignoring certain words or reading the contract in such a way as to make any words "meaningless." *Cumberland County Improvement Auth. v. GSP Recycling Co., Inc.,* 358 N.J.Super. 484, 818 A.2d 431, 438 (2003). In other words, we must interpret the word "indemnify" in relation to the words "defend" and "hold harmless." *Cf. United States v. CDMG Realty Co.,* 96 F.3d 706, 714 (3d Cir.1996) (noting "the constructional canon *noscitur a sociis,* which states that one may infer meaning by examining the surrounding words"), *cited with approval in State v. Watkins,* 193 N.J. 507, 940 A.2d 1173, 1183 (2008). When we apply these principles to the clause on which IFF relies, it becomes clear that, just as Dammann cannot "defend" IFF from itself or "hold harmless" IFF for IFF's own wrong, Dammann cannot "indemnify" IFF for IFF's own loss. Put another way, the only sensible reading of that clause evidences a requirement that third-party liability exist for the clause to be triggered. IFF's interpretation impermissibly reads that requirement out of the contract. *See, e.g., Hardy,* 965 A.2d at 1169–70 (declining to read an insurance contract in such a way as to render certain terms meaningless). As a consequence, IFF's indemnification crossclaim for first-party damages fails as a matter of law. By extension, we do not find that the District Court abused its discretion in de-

nying IFF's request for leave to assert that crossclaim.[12]

■ Turning next to IFF's express indemnification crossclaim based on third-party damages, we must again consider the clauses' language. IFF argues that both clauses obligate Dammann to indemnify IFF for IFF's liability to its customers based on the contaminated flavoring and that IFF alleged as much in its proposed crossclaim. IFF gives the first clause too liberal a reading. As noted above, that clause requires Dammann to compensate IFF for "loss or damage based on personal injury or destruction of property due to defects" in the vanilla beans. (App.196.) IFF's proposed crossclaim is devoid of even an oblique suggestion that any customer that asserted a claim against IFF suffered personal injury or property damage. Accordingly, the District Court did not abuse its discretion when it concluded that IFF failed to state a claim based on the first clause.[13]

■ IFF's understanding of the second clause is likewise misguided. That clause, as noted above, requires Dammann to compensate IFF for losses "arising out of or . . . associated with the design, instal-

lation, and/or operation of any production formulation, packaging, or support equipment . . . used in the production, processing or handling of the product(s) sold hereunder and all raw materials used in the production[.]" (App 197.) IFF clings to the phrase "raw materials" to show that it adequately alleged that its customers suffered damage to their raw materials. IFF's isolation of that phrase is unavailing. The clause at issue here clearly imposes an obligation on Dammann only if IFF incurs liability to a third party in connection with "the design, installation, and/or operation of any production formulation, packaging, or support equipment." The remaining portion of the clause that IFF spotlights has not been triggered because IFF does not allege that its predicate—the first part of the clause—is met. That is, IFF nowhere alleges that any claim against it by a third party bears any relation to the "design, installation, and/or operation" of the various activities enumerated in the rest of the clause. IFF has therefore failed to state an indemnification claim for third party damages, and the District Court, by extension, did not abuse its discretion in denying IFF's request as it pertained to that crossclaim.[14]

---

**12.** Although the District Court did not resolve this issue solely on the basis of the parties' contract, as we do, we may affirm on any ground supported by the record. *Nicini v. Morra,* 212 F.3d 798, 804 (3d Cir.2000) (en banc).

**13.** IFF asserts that, liberally construed, its proposed indemnification crossclaim based on the first clause contains adequate allegations from which to infer that its customers' claims were due to personal injury or destruction of property. That assertion is unpersuasive. The Supreme Court has recently made clear that a "a complaint must contain sufficient factual matter . . . to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* — U.S. ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (internal quotation

marks and citation omitted). Glaringly absent from IFF's proposed crossclaim is any factual allegation whatever regarding the nature of its customers' purported losses. We must reject IFF's position that we should infer facts where none have been alleged, as it is clearly at odds with governing pleading standards.

**14.** IFF argues that, even if we agree with the District Court, we should remand to allow IFF to amend its express indemnification crossclaim. In this Court, "if a complaint is vulnerable to [Federal Rule of Civil Procedure] 12(b)(6) dismissal, a district court must permit a curative amendment, unless an amendment would be inequitable or futile." *Phillips v. County of Allegheny,* 515 F.3d 224, 236 (3d Cir.2008) (citation omitted). That

Accordingly, we conclude that the District Court did not abuse its discretion in denying IFF's request for leave to assert an express indemnification crossclaim.

### C. IFF's Proposed Implied Indemnification Crossclaim

■ IFF challenges the District Court's denial of its request with respect to its proposed implied indemnification crossclaim. The District Court found that crossclaim wanting for many of the same reasons discussed above. To the extent IFF sought compensation for first-party damages, the Court found that IFF in fact stated a direct liability claim. To the extent IFF sought compensation for third-party damages, the Court noted that IFF failed to allege that it had incurred "any 'legal obligation' under which it was compelled to pay the claimed money to its customers and distributors" and failed to point to any "settlement agreement, court order, etc. under which it was obligated to make these payments." *Travelers Indem.*, 592 F.Supp.2d at 768. Accordingly, the

District Court held that IFF failed to state a claim for implied indemnification.

IFF has no quarrel with the District Court's determination that it did not state a claim for first-party damages because, according to IFF, it never asked for such damages. Instead, IFF trains its sights on the District Court's ruling with respect to its indemnification crossclaim for third-party damages. In its brief, IFF recites the following chronology to support that crossclaim: IFF notified the Food and Drug Administration ("FDA") of the potential contamination of the vanilla beans it bought from Dammann; the FDA subsequently classified those beans as "adulterated" under federal law; IFF's sale of vanilla extract made from the adulterated beans led to customer claims against IFF; and IFF made demand on Dammann for compensation in connection with those claims. IFF maintains that it is strictly liable under New Jersey law for its vanilla extract sales and that it was therefore obligated to compensate its customers. In IFF's view, its "customers did not need to establish [its] 'legal obligation' through a

---

rule applies "even if the plaintiff does not seek leave to amend." *Id.* at 245 (citation omitted). Our application of that rule ordinarily has not arisen in the context, presented here, in which a litigant's motion for leave to file a crossclaim is denied on Rule 12(b)(6) grounds. However, we have also explained that " '[f]utility' means that the complaint, as amended, would fail to state a claim upon which relief could be granted." *In re Burlington Coat Factory*, 114 F.3d at 1434 (citation omitted). Thus, we have found no abuse of discretion where a district court has denied a litigant leave to amend on futility grounds based on a finding that the proposed claim would be subject to dismissal under Rule 12(b)(6). *See, e.g., In re Alpharma Sec. Litig.*, 372 F.3d 137, 153–54 (3d Cir.2004); *In re Burlington*, 114 F.3d at 1435. IFF's position that it should have been forewarned by the District Court of the insufficiency of its proposed crossclaims is unsupported by our precedent. Furthermore, to the extent IFF

contends that it was caught off-guard by the District Court's denial of its request for leave, we see no basis in the record for such a contention. We have held, in similar, though not identical, circumstances that a district court may *sua sponte* "raise the issue of the deficiency of a complaint under Rule 12(b)(6), so long as the plaintiff is accorded an opportunity to respond." *Oatess v. Sobolevitch*, 914 F.2d 428, 430 n. 5 (3d Cir.1990) (citations omitted). Here, one of the grounds on which the appellees opposed IFF's motion for leave in the District Court was IFF's alleged failure to state indemnification claims based on the very language of the indemnification clauses in IFF's contract with Dammann. Therefore, IFF was on notice that its proposed crossclaims were being challenged on pleading-sufficiency grounds and had an opportunity to meet that challenge. And, in fact, IFF filed a reply brief in which it availed itself of that opportunity, albeit unsuccessfully. In short, IFF cannot complain that it was blindsided.

lawsuit [because] IFF made ... payment ... under penalty of law." (Appellant's Br. 58.)

■ In New Jersey, the right of indemnity "is a right which enures to a person who, without active fault on his own part, has been compelled, *by reason of some legal obligation,* to pay damages occasioned by the initial negligence of another, and for which he himself is only secondarily liable." *Adler's Quality Bakery, Inc. v. Gaseteria, Inc.,* 32 N.J. 55, 159 A.2d 97, 110 (1960) (emphasis supplied and internal quotation marks and citation omitted); *see also George M. Brewster & Son, Inc. v. Catalytic Constr. Co.,* 17 N.J. 20, 109 A.2d 805, 810 (1954) ("Indemnitors are within the rule that the doctrine may be invoked in favor of *one who is under a legal duty* to repair a loss ensuing from the tortious act or omission of another." (emphasis supplied and citations omitted)); *Tryanowski v. Lodi Bd. of Educ.,* 274 N.J.Super. 265, 643 A.2d 1057, 1061–62 (1994).

■ Here, because Dammann's duty to indemnify arises from a "legal obligation to pay damages," IFF had to allege a legal duty to compensate its customers in order to state an implied indemnification claim. A careful review of IFF's proposed crossclaim reflects no such allegation. Although IFF states that it notified both its customers and the FDA of possible contamination and that the vanilla beans were later determined to be prohibited from sale under federal law, IFF alleges—in the product liability count of its proposed crossclaim—only that it "was required to issue credits and/or refunds to its customers and distributors that had purchased mercury contaminated flavor products" and that "Dammann owes a common law duty to indemnify IFF." (App. 307, 310.) Importantly, that allegation refers only to some amorphous, unspecified requirement. Even the most indulgent reading does not suggest that IFF was *legally* obligated to compensate its customers. The absence of such an allegation is fatal to IFF's proposed indemnification claim.[15] Accordingly, we will decline to upset the District Court's holding that IFF failed to state an implied indemnification claim for third-party damages.[16]

---

**15.** In its appellate brief, IFF argues that it was in fact legally obligated to pay its customers because of its alleged strict liability under New Jersey law. But before the District Court IFF never explicitly pressed any such legal obligation. In its reply to CBI's opposition to the appeal of Judge Shipp's ruling, IFF asserted only that "there is no support for CBI's contention that IFF had no legal obligation to make payment to those customers who were supplied with the mercury[-]contaminated product." (IFF's Reply Br. in Support of Appeal of August 13, 2008 Order and for Leave to File Am. and Supp. Cross-cl. at 15, Nov. 10, 2008.) In its proposed crossclaim, however, IFF alleged only that the extract it produced using the contaminated beans was prohibited from sale under federal law. Importantly, there was no allegation that such a prohibition retroactively imposed an actual legal duty on IFF to compensate its customers. In essence, IFF seeks to retrofit

arguments presented on appeal onto allegations it failed to incorporate into its proposed crossclaim and accompanying motion for leave before the District Court. Because IFF did not present such a legal obligation to the District Court, it is precluded from doing so in this Court. *See Fletcher–Harlee Corp. v. Pote Concrete Contractors, Inc.,* 482 F.3d 247, 253 (3d Cir.2007).

Judge Stapleton would affirm the District Court's ruling on the common law indemnity claim because the Food, Drug, and Cosmetic Act, the foundation of its argument before the District Court, does not create a private cause of action available to IFF's customers. *In re Orthopedic Bone Screw Prods. Liab. Litig.,* 193 F.3d 781, 788 (3d Cir.1999).

**16.** We express no opinion on the District Court's conclusion—specifically challenged by IFF—that the absence of a "settlement agreement[ ] [or] court order[,]" *Travelers Indem.,*

## IV. CONCLUSION

For the foregoing reasons, we will affirm the District Court's judgment.

592 F.Supp.2d at 768, was fatal to IFF's claim. Our more limited holding is premised only on IFF's failure to allege the existence of a legal duty, not on the existence *vel non* of a settlement agreement or judgment against IFF.